UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CANDI PERRY,                          )
              Plaintiff,              )
                                      )
      vs.                             )        1:11-cv-0172-RLY-TAB
                                      )
CITY OF INDIANAPOLIS,                 )
              Defendant.              )

### ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Candi Perry, is a police officer for the Indianapolis Metropolitan Police Department ("IMPD").  Officer Perry alleges that the Defendant, City of Indianapolis, violated her constitutional and state law rights when she was investigated and subsequently indicted by a grand jury for acts of official misconduct and filing a false crime report.  Defendant now moves for summary judgment.  The court, having read and reviewed the supporting and opposing briefs, the designated evidence, and the applicable law, now **GRANTS** Defendant's Motion for Summary Judgment.

### I.     Background

On June 25, 2009, IMPD officers were dispatched to the northwest side of Indianapolis where they discovered the body of Herman A. Clark, the victim of an apparent fatal gunshot wound to the chest.  (Affidavit of Douglas L. Cook ("Cook Aff.") ¶ 3).  A criminal homicide investigation was initiated, and Douglas Cook was designated as the lead detective on the case.  (*Id*. at ¶ 4).

On June 26, 2009, Perry was approached in her squad car by a man ("Informant") who claimed to have information, which Perry later discovered, related to Clark's

1

murder.  (Affidavit of Candi Perry ("Perry Aff.") ¶ 6).   Perry is an African-American female who has worked as a police officer since 1995 and been employed by the IMPD since January 2007.  (*Id*. at ¶ 4; Second Amended Compl.  ("Compl.") ¶ 7).  Perry claims she neither knew the identity of the Informant nor had him in her custody, and he did not immediately indicate he had knowledge about the murder, other than an offhand comment that "it didn't happen in the car."  (Perry Aff. ¶ 7).

Upon hearing that a homicide had occurred in her area the prior day, Perry requested the contact information for Detective Cook.  (*Id*. at ¶¶ 8-9).  Cook received a page from Perry that day to contact her regarding the homicide investigation.  (Cook Aff. ¶ 5).  Perry told Cook that while on duty near 3700 North Clifton Street, a man flagged her down because he wanted to provide information concerning the prior evening's homicide.  (*Id*. at ¶ 6).  Perry relayed the details the man provided to Cook, including the description of the scene of the shooting.  (*Id*.).  At that time, Perry maintained that she did not know the identity of the Informant or where he lived and could not provide any additional information.  (Perry Aff. ¶¶ 11, 14).  Cook instructed Perry to bring the Informant down to the Homicide Branch Office immediately, but Perry stated she had already released the man.  (Cook Aff. ¶¶ 7-8).  Cook requested Perry to provide the Informant's pertinent identifying information while conveying the critical importance of the man as a potential witness to the homicide.  (*Id*. at ¶ 9).  Perry claimed she never exchanged any information with the Informant, nor ever told anyone that she knew him or exchanged information with him.  (Perry Aff. ¶ 20).  Perry did, however, later admit

that she may have been in the Informant's vicinity when she interacted with his young nephew on several occasions.  (*Id*.).

Despite Perry's promise to update Cook with information, Cook called Perry that night to discover whether she obtained the Informant's contact information and to again convey how critically important the man was to the homicide investigation.  (Cook Aff. ¶¶ 11, 13).  Perry responded that she was off-duty Saturday and Sunday but would resume her search for the witness when she returned on Monday.  (*Id*. at ¶ 14).  Although Cook told Perry to leave her cell phone on and await further instructions, numerous follow-up calls were not answered between 9:00 p.m. and 10:00 p.m. that night.  (*Id*. at ¶¶ 14-15).

Cook then met with Detective Catherine Cummings, who agreed to follow up with Perry.  (*Id*. at ¶ 16).  Cummings called Perry and asked her about her contact with the Informant and any other information she may have about him.  (Affidavit of Catherine Cummings ¶¶ 3-5).  Again, Perry maintained she did not personally know the Informant and had no way of identifying him.  (*Id*. at ¶ 6).

Between 10:30 p.m. and 11:30 p.m on June 26th, Perry called Detective Steven Scott and asked for assistance in locating the Informant in the neighborhood where she currently worked.  (Affidavit of Steven A. Scott ("Scott Aff.") ¶¶ 4-5).  Scott had not been assigned as a detective to the homicide case at that time.  (*Id*. at ¶ 6).  Perry had Scott drive her to the area of Clifton Street and 37th Street.  (*Id*. at ¶ 7).  Perry canvased the neighborhood in search of the Informant and left her contact information with one of the houses.  (Perry Aff. ¶ 15).  Perry returned to Scott's car and alerted him that a woman

at one of the houses may be a relative of the Informant.  (*Id*. at ¶ 19).  Scott suggested

they visit the relative's home a second time in order to get the Informant's phone number.

(Scott Aff. ¶ 10).  Perry visited the home a second time, but did not get the Informant's

number; instead, she left a number for him to call her.  (*Id*. at ¶ 11).

On June 27, 2009, around 12:00 a.m., Perry contacted Cook and alerted him that

her search for the Informant's residence was being terminated and she did not find any

names, addresses, telephone numbers, and/or vehicle descriptions for the man.  (Cook

Aff. ¶ 17).  Cook alerted his supervisor, IMPD Homicide Lieutenant Kevin Kelly, about

Perry's actions, and Kelly ordered Cook to ask Perry to come down to the Homicide

Branch Office to look at a photo imaging machine to identify the man.  (*Id*. at ¶¶ 18-19).

Perry agreed and arrived at approximately 1:00 a.m. to answer questions in a conference

room.  (*Id*. at ¶¶ 19-20).  Cook asked questions about identifying the Informant, but at the

time of the interview, Perry was not a possible suspect to any criminal investigation.  (*Id*.

at ¶¶ 21-22).  Perry denied personal knowledge of the Informant, but admitted she knew

who he was from the neighborhood.  (*Id*. at ¶ 23).  Perry was shown approximately 250

photos but could not identify any of them as the Informant.  (*Id*. at ¶ 24).  Perry was then

ordered to drive around the neighborhood in an attempt to locate the Informant and, if she

did, notify the Communications Branch and immediately take the witness to the homicide

office for questioning; further, if the Informant were unwilling to cooperate, Perry was

ordered to immediately notify Kelly so that Kelly or Cook could speak to the Informant

in person.  (*Id*. at ¶¶ 25-26).

On the morning of June 27th, the Informant called Perry's cell phone and agreed to meet Perry at the crime scene to give her information. (Perry Aff. ¶ 17). The Informant initially refused to go to the homicide office despite Perry's requests. (*Id*. at ¶ 18). Perry met the Informant in the area of 33rd Street and Rader, and the Informant proceeded to describe the events surrounding the shooting by walking Perry through the crime scene. (Def.'s Ex. F at 19-25). During this time, one of the suspected shooters pulled up to Perry and the Informant and started talking with the Informant. (*Id*. at 26-27).

Between 11:30 a.m. and 12:00 p.m., Perry called Scott and told him she had been at the homicide crime scene with the Informant and had been spotted by one of the suspected shooters in the homicide. (Scott Aff. ¶ 12). After the call, Scott picked up Perry and took her to her car. (*Id*. at ¶ 13). Perry admitted to Scott that the Informant's first name was Dave and that she had his phone number. (*Id*. at ¶ 14). Perry paged Kelly and informed him that she had made contact with the Informant and obtained full details and descriptions for the homicide investigation including a walkthrough of the crime scene; however, she alerted him that she had already released the witness before contacting him. (Cook Aff. ¶ 30).

At approximately 4:00 p.m. that day, Perry returned to the IMPD Homicide Branch. (*Id*. at ¶ 31). Perry provided a statement to homicide Detectives James Vaughn and Cook as part of the ongoing homicide investigation. (*Id*. at ¶ 32). Perry stated that she discovered that the Informant may go by the name "Dave," but she did not otherwise know the Informant or the Informant's address. (*Id*. at ¶¶ 33, 35). Similarly, Perry also

denied knowing the suspected shooter that approached her that day and claimed the Informant did not provide such information.  (*Id*. at ¶ 34).  Perry provided a phone number for the Informant and, as a result, was able to arrange a meeting with him.  (*Id*. at ¶ 36).  Later that same day, Perry and Scott met the Informant and brought him in to the Homicide Office for an interview.  (*Id*. at ¶¶ 37-38).

After Perry gave Vaughn and Cook a statement, Deputy Chief William Benjamin, Kelly, and Lieutenant Darryl Pierce also entered the room.  (Perry Aff. ¶ 27).  Perry repeatedly asked to leave but was not permitted.  (*Id*. at ¶ 26).

Sergeant Brian Churchill of Internal Affairs then conducted a separate interview with just Perry concerning her knowledge of the Informant.  (*Id*. at ¶¶ 28-29; Affidavit of Brian Churchill ("Churchill Aff.") ¶¶ 5-6).  Perry again maintained she did not know the Informant, had not gathered any pertinent identification information during her prior encounters with him, and did not know the suspected shooter she encountered at the crime scene.  (Churchill Aff. ¶¶ 7-8).  Perry claims Churchill asked questions such as "why are you dressed that way?"; "do you date the confidential informant, or the criminal suspect?"; "even when you go out, do you go over there?"; "have you ever hooked up with him?"; and "is he an ex of yours?"  (Perry Aff. ¶ 29).  Churchill claims he offered Perry water during the interview but she refused.  (Churchill Aff. ¶ 10).  On the other hand, Perry alleges she was interrogated for approximately 10 hours in total and at no time did she receive food, water, or her blood pressure medication.  (Perry Aff. ¶ 30).  She also was never read her Miranda rights.  (*Id*. at ¶ 31).

Churchill later questioned the Informant, David Stone, about his contact with Perry in creating his Internal Affairs Summary Report.  (Churchill Aff. ¶ 15).  The Internal Affairs Investigation was conducted separate and independent from any criminal investigation into the subject matter.  (*Id*. at ¶ 17).

In July 2009, Mary Hutchison was assigned as the lead Prosecutor for the Grand Jury Investigation of Perry.  (Affidavit of Mary Hutchison ("Hutchison Aff.") ¶ 3).  The Grand Jury Unit conducted its own investigation into Perry's case, including gathering evidence and conducting witness interviews.  (*Id*. at ¶ 4).  This investigation was done separate and independent from any prior investigation conducted by IMPD Internal Affairs.  (*Id*. at ¶ 5).  On October 26, 2009, after a hearing and presentation of evidence to the grand jury, Perry was formally indicted for Official Misconduct as a Class D Felony and False Reporting or Informing as a Class A Misdemeanor.  (*Id*. at ¶ 7; Def.'s Ex. J).

On October 27, 2009, IMPD served Perry with a Notice of Discharge Recommendation and Order pursuant to Section 253-208(d)(4).  (Def.'s Ex. A-5).  Specifically, the Notice stated that Chief of Police, Michael Spears, determined that Perry violated the Rules and Regulations of the IMPD and recommended her discharge.  (*Id*.).  As a result, Chief Spears ordered Perry suspended indefinitely without pay, pending review by the Indianapolis Metropolitan Civilian Police Merit Board.  (*Id*.).

On October 28, 2009, Defendant, through its agents, allegedly published false comments and statements to City media outlets that Perry: (1) was negligent and incompetent; (2) gave false information to IMPD officers; and (3) impeded a criminal investigation.  (Compl. ¶ 20).  Particularly, a WTHR.com news article quoted police

records, in which detectives called Perry "incompetent and negligent." (*Id*. at ¶ 22; Verified Statement of Gregory P. Gadson, Ex. A).

On November 25, 2009, the criminal case against Perry was transferred to Marion Superior Court, but Hutchison, as lead Prosecutor, filed a motion to dismiss all criminal charges. (Hutchison Aff. ¶¶ 10-11). After this dismissal, Chief Spears withdrew Perry's Notice of Discharge Recommendation and reinstated Perry as a patrol officer in the Northwest District of IMPD, effective January 1, 2010. (Def.'s Ex. A-2). On January 27, 2010, Chief Spears modified Perry's indefinite suspension to a sixty-day suspension without pay for violation of the Department's Rules and Regulations; however, on May 5, 2010, the suspension was again modified to only a ten calendar day suspension without pay. (Def.'s Exs. A-3, A-4).

On February 1, 2010, Perry filed a Notice of Charge of Discrimination against Defendant. (Def.'s Ex. K). In the Charge, Perry alleged that she had been "discriminated against due to [her] race, Black." (*Id*.). On October 13, 2010, the EEOC issued a determination that based on its investigation, "the EEOC is unable to conclude that the information obtained establishes violations of the statutes." (Def.'s Ex. L).

On January 11, 2011, Perry initiated this suit in Marion Superior Court against the City and individual defendants, Gregory A. Ballard, Mayor of Indianapolis; Frank Straub, Director of Public Safety; and Paul Cieselski, Chief of Police, for alleged violations of her constitutional and state law rights. On February 4, 2011, Defendant removed the suit to this court. On March 6, 2012, the court dismissed the suit in its entirety but granted Perry leave to file a Second Amended Complaint. Perry filed a Second Amended

Complaint on April 5, 2012, against the Defendant only, alleging violations of her due process and equal protection rights pursuant to the Fourteenth Amendment to the U.S. Constitution, as well as the Indiana Constitution, and for damages resulting from tortious conduct, including false imprisonment and arrest, and defamation.  Defendant now moves for summary judgment on all counts.

## II.      Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A "material fact" is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute as to a material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id*. at 249.

The burden is upon the movant to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which the movant believes demonstrates an absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Parties may assert that "the materials cited do not establish the absence or presence of a genuine dispute," and parties may also object to the admissibility in evidence of the material cited.  FED. R. CIV. P. 56(c)(1), (2).  Once the movant has met this burden, the nonmoving party may not rest upon mere allegations or denials in its pleadings, but "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250.

In deciding a motion for summary judgment, a court must review the record and draw all reasonable inferences in the light most favorable to the non-moving party. *Id.* at 255. In sum, the court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

## III.  Discussion

### A.  Federal Claims

#### 1. *Monell* Claims

Title 42 U.S.C. § 1983 ("Section 1983") does not itself create substantive rights but provides "a means for vindicating federal rights conferred elsewhere." *Padula v. Leimbach,* 656 F.3d 595, 600 (7th Cir. 2011) (internal quotations and citation omitted). Perry brings the following claims under Section 1983: substantive and procedural due process, equal protection under the Fourteenth Amendment, and equal rights under 42 U.S.C. § 1981.

It is well settled, though, that Section 1983 does not allow for municipal liability against entities such as the Defendant based only on a theory of respondeat superior. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). "Governmental entities cannot be held liable for the unconstitutional acts of their employees unless those acts were carried out pursuant to an official custom or policy." *Greiveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008) (citations omitted). In order to properly maintain a Section 1983 action against a municipality, a plaintiff must demonstrate one of the following:

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as

10

> to constitute a custom or usage with the force of law; or (3) an allegation
> that the constitutional injury was caused by a person with final
> policymaking authority.

*McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995) (internal quotations and

citation omitted).  Further, the policy must be the "moving force" behind the

constitutional violation.  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989).  At

bottom, "[m]isbehaving employees are responsible for their own conduct, [and] units of

local government are responsible only for their policies rather than misconduct by their

workers."  *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (citation omitted).

Here, Perry argues that Defendant can be held liable because Chief Spears acted as

a final policymaker and "was involved in the process of deciding to refer Perry for

criminal prosecution."  (Pl.'s Resp. 10).  The status as a policymaker for Section 1983

purposes is conferred by state or local law.  *Kujawski v. Board of Com'rs of Bartholomew*

*County, Ind.*, 183 F.3d 734, 737 (7th Cir. 1999).  Under Indiana law, a police chief is a

final policymaker for his municipal police department.  *Eversole v. Steele*, 59 F.3d 710,

716 (7th Cir. 1995).

That does not, however, end the inquiry, as the issue "turns on the nature of the

actions at the heart of the claim."  *Ector v. Powell*, No. 00-20-C-B/S, 2002 WL 356704,

at *4 (S.D. Ind. Mar. 1, 2002).  The "power to manage the members of a municipal police

department is distinct from the power to fashion policy on behalf of the City."  *Id*. (citing

*Venters v. City of Delphi,* 123 F.3d 956, 966 (7th Cir.1997)).  Accordingly, the question

is whether the decision maker was "at the apex of authority for the action in question."

*Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468 (7th Cir. 2001).  For

11

instance, an "executive official who rather than making policy merely implements legislative policy acts merely as a delegate of the legislature, and his act is therefore not the act of the municipality itself for purposes of liability under section 1983." *Id*. Instead, "the official who commits the alleged violation of the plaintiff's rights has authority that is final in the special sense that there is no higher authority." *Id*. at 469.  In other words, the court must examine whether a connection exists between Chief Spears's area of policymaking authority and the acts underlying the constitutional claim.  *See Ector*, 2002 WL 356704 at *5.

Here, Chief Spears was not at the apex of authority for the action in question – referring Perry for criminal prosecution.  Even if Chief Spears suggested to the Prosecutor that criminal charges be brought against Perry, this was not the final decision. Instead, the Prosecutor conducted an investigation, a grand jury hearing was held, and an indictment was returned.  Chief Spears had no authority or supervision in these activities. Thus, Chief Spears did not act as the final policymaker for IMPD in the realm of whether charges were filed against Perry.  As a result, Perry cannot show that her constitutional injury was *caused* by a person with final policy-making authority.  *See Billings v. Madison Metro. Sch. Dist.*, 259 F.3d 807, 818 (7th Cir. 2001).

The court, therefore, finds that Chief Spears did not act as a final policymaker with respect to Perry's alleged constitutional violations.  Accordingly, the court grants summary judgment on Perry's *Monell* claims.  Specifically, the court grants summary judgment against Perry's claims for due process (Count 1), equal protection (Counts 2 and 7), and 42 U.S.C. § 1981 (Count 3).  The court now turns to Perry's remaining

federal claims, her Title VII claims for gender discrimination, race discrimination, and retaliation.

### 2.  Title VII

Perry alleges that Defendant violated Title VII of the Civil Rights Act of 1974 when it discriminated against her on account of her race and gender.  (Compl. ¶ 80).  She also alleges that Defendant unlawfully retaliated against her for "challenging recommended discipline" by erasing "valuable personnel and information from the Defendant's computer files," which has allegedly placed her pension benefits in jeopardy.  (*Id*. at ¶¶ 39, 81).  Perry filed a Notice of Charge of Discrimination with the EEOC on February 1, 2010, alleging only race discrimination.  (Def.'s Ex. K).

### a.  Gender Discrimination and Retaliation

Defendant seeks summary judgment on Perry's Title VII claims for gender discrimination and retaliation because Perry did not include such allegations in her EEOC Charge, and thus, failed to exhaust her administrative remedies.  *See Finch v. City of Indianapolis*, 886 F. Supp. 2d 945, 963 (S.D. Ind. 2012) (stating "Title VII claims are subject to an administrative exhaustion requirement, and a plaintiff ordinarily may pursue in court only those claims he included in an EEOC charge or that are sufficiently alike or reasonably related to the allegations made in the EEOC charge").  Perry failed to respond to this argument, and thus waives these claims.[1]  *Central States, Southeast & Southwest*

---

[1] The court notes that Perry's failure to allege retaliation in her EEOC claim may not have barred her claim as the Seventh Circuit has distinguished "between claims of retaliatory conduct that occurred before the filing of the EEOC charge and those that occurred after, and because of, the filing of an initial EEOC charge."  *Finch*, 886 F. Supp. 2d at 963.  To that end, claims that the

*Areas Pension Fund v. Midwest Motor Express, Inc.,* 181 F.3d 799, 808 (7th Cir.1999)

("Arguments not developed in any meaningful way are waived"); *see also Mathis v. New*

*York Life Ins. Co.*, 133 F.3d 546, 548 (7th Cir. 1998) ("A litigant who fails to press a

point by supporting it with pertinent authority, or by showing why it is sound despite a

lack of supporting authority . . . forfeits the point" (citation omitted)).  Accordingly,

Defendant is granted summary judgment on the Title VII claims for gender

discrimination and retaliation.

### b.  Race

Defendant also moves for summary judgment on Perry's Title VII claim for race

discrimination on the basis that she failed to satisfy the indirect method of proof via the

burden-shifting approach outlined in *McDonnell Douglas Corp. v. Green*.  411 U.S. 792

(1973).   Under the *McDonnell Douglas* framework, a plaintiff must first establish a

prima facie case of race discrimination by showing: (1) she is a member of the protected

class, (2) she met her employer's legitimate expectations, (3) she suffered an adverse

employment action, and (4) her employer treated similarly situated Caucasian employees

more favorably.  *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dept.*, 510

F.3d 681, 687 (7th Cir. 2007).  If this standard is met, "the employer must offer a

legitimate nondiscriminatory reason for the adverse employment action, which the

employee may rebut by showing that the reason is a mere pretext for discrimination."  *Id.*

---

employer retaliated against the plaintiff after the charge of discrimination did not require an
additional filing to comply with Title VII.  *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473,
482 (7th Cir. 1996).  Perry, however, failed to advance any factual basis for her retaliation claim
aside from the vague conclusory allegations in her complaint.  Therefore, the court has no basis
upon which to find that her retaliation claim meets this exception.

For the reasons set forth below, Perry cannot establish a prima facie case because she can neither show similarly situated individuals were treated more favorably nor show she was meeting her employer's legitimate job expectations.

### i. Similarly Situated Individuals Treated More Favorably

"A similarly situated employee for purposes of proving discrimination refers to employees who were directly comparable to [the plaintiff] in all material respects." *Brummett v. Sinclair Broad. Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005) (citation and internal quotations omitted). In making this determination, the court "must look at all relevant factors, the number of which depends on the context of the case." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). As such, when "a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason . . . [then] a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct." *Id.* (citation omitted). Generally, a plaintiff may accomplish this by "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 617-18.

Perry offers scant evidence that a similarly situated Caucasian officer was treated more favorably. Perry first alleges that "white male police officers accused of similar, or similarly classified behavior are not disciplined in the same manner as was Officer Perry." (Compl. ¶ 40). In addition, the Notice of Charge of Discrimination states,

"Police Officer Jean Deddish (White) has been accused of falsifying information.  Ms. Deddish was not treated like I was."  (Def.'s Ex. K).  Finally, Perry points to Deputy Chief Benjamin's testimony, without producing any citation for the court, claiming he testified that "other officers with far worse transgressions were not treated as shabbily as Officer Perry."  (Pl.'s Resp. 12).  Although the court is not obligated to decipher Perry's argument, the court concludes Perry is referring to Benjamin's following testimony: "I just didn't think [the termination of Perry] was right.  As long as I had been with the department, officers have done worse and were never charged."  (Deposition of William J. Benjamin ("Benjamin Dep."), 18:17-20).

As an initial matter, Perry's vague, conclusory allegation about white male officers being treated differently is not sufficient to survive summary judgment. *Anderson*, 477 U.S. at 256 (nonmoving party may not rest upon mere allegations in its pleadings, but "must set forth specific facts showing that there is a genuine issue for trial").  Similarly, the allegations in the EEOC Charge provide little support for Perry's claim nor does Perry reference them in her argument.  In fact, Perry does not reference either Deddish or any other officer in her Response as a similarly situated Caucasian officer.  Instead, Perry principally relies on Benjamin's vague, general, and conclusory statement that "officers have done worse and were never charged."  (Benjamin Dep. 18:18-19).  This vague comment neither mentions any kind of racial basis for these decisions nor provides a single example for the court to compare.  As a result, Benjamin's testimony offers nothing to support a claim of race discrimination.

At no point has Perry pointed to any evidence in the record as to a similarly situated employee's name, let alone that employee's supervisor, performance standards, or similar conduct he/she engaged in with different treatment.  Accordingly, Perry fails to satisfy this prong, and thus, Defendant's motion for summary judgment is granted as to Perry's Title VII race claim.

### ii.  Meets Legitimate Employment Expectations

Though it is not necessary for the court to evaluate Perry's Title VII claim any further, as a matter of completeness the court briefly turns to whether Perry established she was meeting her employer's legitimate employment expectations.  Perry argues that it is "undisputed" that she was meeting legitimate employment expectations based on her prior commendations and awards for Officer of the Year.  (Pl.'s Resp. 12).  But as Defendant notes, these reviews and awards all took place prior to the events that led to her criminal indictment.  In determining whether the plaintiff satisfies this prong, the "focus is not the employee's past performance but whether the employee was performing well at the time of the termination."  *Khan v. Prison Health Services, Inc.*, No. 1:03-cv-0719, 2005 WL 1939943, at *4 (S.D. Ind. June 28, 2005) (granting summary judgment for defendant because of plaintiff's failure to meet employer's expectations where plaintiff submitted positive performance evaluations from prior years but reviews closer to termination were marginal) (citing *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002)).

At the time of termination, Perry had just been indicted on felony and misdemeanor charges.  On the other hand, Perry points to awards she received as an officer, including Officer of the Year in 2008 and Community Officer of the Year in 2009.  (Perry Aff. ¶ 5).  Even giving Perry the benefit of her prior commendations and awards, all of these came prior to the events which led to her termination and which are at the heart of this lawsuit.  Thus, Perry has failed to cite to any evidence in the record showing she met IMPD's legitimate employment expectations at the time of her termination.  Even more, in addition to her criminal indictment, Perry also was suspended for violation of Department rules based on this conduct, which remained in place even after the charges were dropped.  (Def.'s Exs. A-3, A-4).  As a result, it is clear Perry has not met her burden of showing she was meeting IMPD's legitimate employment expectations.  *See Morton v. Associated Dry Goods Corp.*, 792 F. Supp. 1136, 1145 (S.D. Ind. 1992) (stating "the guidelines for determining whether an employee is performing according to his employer's legitimate expectations are set by the employer").

In sum, Perry fails to meet her burden for two elements, and thus fails to establish a prima facie case of racial discrimination.  "Without a *prima facie* case, the plaintiff cannot withstand summary judgment."  *Hong v. Children's Memorial Hosp.,* 993 F.2d 1257, 1261 (7th Cir. 1993) (citation omitted).  Accordingly, Defendant's motion for summary judgment on Perry's Title VII claim for racial discrimination is granted.

### B.  State Claims

Although the court dismissed Perry's federal claims, the court will address Perry's supplemental state law claims since they arise out of the same set of facts as her federal

claims.  28 U.S.C. § 1367(a).  The court previously dismissed Perry's defamation and false arrest/imprisonment claims against Defendant without prejudice in an entry dated March 6, 2012.  *Perry v. City of Indianapolis*, No. 1:11-cv-172, 2012 WL 729728 (S.D. Ind. Mar. 6, 2012).  Perry subsequently filed a Second Amended Complaint against Defendant asserting the same tortious conduct, but she has failed to develop these claims, submit evidence, or modify her theory of the case.

### 1. False Imprisonment/ False Arrest

Under Indiana law, a plaintiff must establish the absence of probable cause for the arrest to succeed on a claim of false arrest or false imprisonment (hereinafter, "false arrest").  *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1104 (S.D. Ind. 2008) (citing *Garrett v. City of Bloomington,* 478 N.E.2d 89, 93 (Ind. Ct. App. 1985)).  Perry alleges that despite Defendant's superior knowledge of the circumstances, it arrested, detained, and imprisoned her in bad faith and without probable cause.  (Compl. ¶ 72).  Perry claims her indictment was only acquired through a Prosecutor who did not have full knowledge of all material facts because Defendant "acted in bad faith by not conveying all material evidence about the alleged criminality of Officer Perry."  (*Id*. at ¶¶ 34, 73).  Indeed, according to Perry, the Prosecutor ultimately dismissed all criminal charges against Perry after "discover[ing] new information that was not presented to the grand jury."  (*Id*. at ¶¶ 28-29).

Perry, however, presented similar conclusory allegations in the previously dismissed Amended Complaint, and here she has failed to support them with any evidence in the record.  Specifically, Perry does not cite any evidence of (1) what false

information led to her indictment; (2) what material facts the Prosecutor did not know prior to her indictment; (3) what information Defendant withheld from the Prosecutor; or (4) what new information was discovered that had not been presented to the grand jury. Instead, Perry simply states that Defendant failed to demonstrate probable cause existed for Perry's arrest and "may not hide behind the 'ham sandwich' standard of grand jury indictments."  (Pl.'s Resp. 10).

Despite Perry's critique of criminal procedure, Defendant has sufficiently satisfied its burden to show probable cause existed.  Hutchison, as lead Prosecutor for the grand jury investigation of Perry, gathered evidence and conducted witness interviews as part of an investigation that was independent of any internal police inquiry.  (Hutchison Aff. ¶¶ 4-5).  Hutchison then presented this evidence to a grand jury.  (*Id*. at ¶ 6).  A grand jury is "an independent body charged with investigating the facts to determine whether probable cause exists that a crime has been committed and whether an indictment (true bill) should be returned against one for such a crime."  *Wurster v. State*, 708 N.E.2d 587, 591-92 (Ind. Ct. App. 1999) (citations omitted).  A grand jury ultimately returned an indictment against Candi Perry for Official Misconduct as a Class D Felony and False Reporting or Informing as a Class A Misdemeanor.  (Hutchison Aff. ¶¶ 6-7).

Indiana courts have long held that the "fact that an indictment was returned by the grand jury was in itself presumptive evidence of probable cause, though subject to be rebutted by proof that it was induced by false testimony or other improper means."  *Duckwall v. Davis*, 194 Ind. 670, 142 N.E. 113, 114 (1924); *Boyd v. Hodson*, 117 Ind. App. 296, 302-03 (1947) (same).  Moreover, this court dismissed Perry's initial false

arrest claim against Defendant, stating that because Perry did not challenge the grand jury proceedings under Rule 6(e) of the Federal Rules of Criminal Procedure, "the grand jury's decision to indict unequivocally reflects that there was probable cause to arrest and prosecute her." *Perry*, 2012 WL 729728 at *3. Accordingly, Defendant met its burden of showing no genuine issues of fact existed as to the existence of probable cause.

Because Defendant met its burden, the court next analyzes whether Perry has created a genuine issue of material fact as to whether probable cause existed. *See Chandler Natural Gas Corp. v. Barr*, 110 F. Supp. 2d 859, 875 (S.D. Ind. 2000) (finding defendants brought forward prima facie evidence of probable cause because a grand jury issued an indictment, and thus, "the burden must then shift to the plaintiffs to bring forward some evidence that there was no probable cause, or that at least there are disputed facts which might lead to an inference that there was no probable cause for the prosecution of the plaintiffs"). Particularly, Perry "must set forth specific facts showing that there is a genuine issue for trial" and cannot merely rely upon the allegations in the pleading. *Anderson,* 477 U.S. at 256.

Perry relies on two main arguments: (1) the Prosecutor dropping criminal charges implies a lack of probable cause; and (2) the Prosecutor did not state in her affidavit that probable cause was still present despite dropping charges, and as a result, this should be considered a tacit admission that probable cause did not exist. Neither of these arguments have any merit or legal support to create a genuine issue of material fact. Under Indiana law, "the termination of a prosecution in favor of the accused is not prima facie evidence that the prosecution was malicious or without probable cause." *Boyd*, 117

Ind. App. at 303.[2]  Similarly, Perry's argument concerning a tacit admission as to the

absence of probable cause is unsound.  It is unsurprising that Perry does not cite any legal

authority for this proposition because no court has likely held something so extreme.

Lastly, Perry also claims – without any evidentiary basis – that "Plaintiff has

presented corroborating evidence that probable cause did not exist to refer her for

prosecution."  (Pl.'s Resp. 11).  This statement alone is not sufficient to create a genuine

issue of fact, and it is not the court's duty to determine what "corroborating evidence" she

might be referencing.  *See Vukadinovich v. Bd. of Sch. Trustees of N. Newton Sch. Corp.*,

278 F.3d 693, 699 (7th Cir. 2002) ("The nonmovant will successfully oppose summary

judgment only when it presents definite, competent evidence to rebut the motion"

(citation omitted)); *Ansick v. Hillenbrand Indus., Inc.*, 933 F. Supp. 773, 777 (S.D. Ind.

1996) (stating "[c]onclusory allegations by a party opposing a motion for summary

judgment cannot defeat the motion").

Although the issuance of an indictment does not foreclose any other inquiry into

probable cause, Perry failed to produce any evidence showing a genuine issue of material

fact exists as to probable cause.  Accordingly, Defendant's motion for summary judgment

is granted on Perry's false arrest claim.

### 2.  Defamation

---

[2] In that same vein, Perry argues that the discovery of additional evidence by the Prosecutor leads
to the conclusion that Defendant withheld evidence from the Grand Jury.  Again, Perry presents
no factual or legal support for this argument other than mere speculation, which is not sufficient.
*Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993) (affirming summary
judgment and stating "plaintiff's speculation is not a sufficient defense to a summary judgment
motion").

Lastly, Perry argues that Defendant committed defamation *per se* by "publish[ing] false comments and statements to City media outlets that Officer Perry: was negligent and incompetent, gave false information to IMPD officers, and impeded a criminal investigation."  (Compl. ¶ 20).  On those grounds, Perry alleges that Defendant's actions were intentional, malicious, and in bad faith because it knew there was no truth in those statements.  (*Id.* at ¶ 26).

These allegations are almost identical to those facts in the Amended Complaint, which ultimately was dismissed, and Perry has submitted little evidence to corroborate these barebones allegations.  Because little has changed since the court's initial analysis of this issue, its reasoning is still on point here:

> [T]he grand jury's indictment forecloses [Perry's] argument that there was no probable cause to arrest and prosecute her.  Thus, Defendants' statements to the media regarding the charges brought against her were not false when made.  As truth is an absolute defense, *Associates Corp. v. Smithley,* 621 N.E.2d 1116, 1119 (Ind.Ct.App.1993), Plaintiff's claim for defamation is not plausible on its face.

*Perry*, 2012 WL 729728 at *4.

Of course, Perry argues that the indictment was based on false information provided by the Defendant, and thus, the indictment alone should not end this analysis. (Pl.'s Resp. 13).  But once again, Perry fails to point to any evidence which establishes a genuine issue of fact as to whether the indictment resulted from false evidence or other improper means.  Simply stating that an indictment was obtained based upon false evidence without any citation to the record is not sufficient to create a genuine issue of

material fact.  Accordingly, Perry has failed to show a genuine issue of fact exists, and thus, Defendant is granted summary judgment on the defamation claim.

### IV.    Conclusion

For the reasons set forth above, Defendant's motion for summary judgment (Docket # 65) is **GRANTED**.

**SO ORDERED** this 23rd day of April 2013.

_____
RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.